UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CHARLES MICHAEL SPARKS,
Plaintiff,

-against-

THE NEW YORK TIMES COMPANY,
Defendant.

Case No. 1:24-cv-00455 (JLR)

**OPINION AND ORDER**

JENNIFER L. ROCHON, United States District Judge:

Plaintiff Charles Michael Sparks ("Plaintiff" or "Sparks") was an employee at Defendant The New York Times Company ("Defendant" or the "Times"). The Times fired him after he returned from parental leave. Sparks alleges that his firing was discriminatory and retaliatory, in violation of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*, and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 *et seq.*; the Times says it was a consequence of Sparks's ongoing poor work performance. Before the Court is the Times's motion for summary judgment on Sparks's claims. For the following reasons, the motion is GRANTED.

## BACKGROUND

### I. Procedural History

Sparks initiated this action by filing a complaint on January 22, 2024. *See* Dkt. 1 (the "Complaint," or "Compl."). The Complaint asserted three causes of action: (1) interference with Sparks's right to benefits under the FMLA, Compl. ¶¶ 53-59; (2) retaliation in violation of the FMLA, *id.* ¶¶ 60-64; and (3) discrimination under the NYCHRL, *id.* ¶¶ 65-71. The Times moved for summary judgment on these claims on November 25, 2025. *See* Dkt. 39; Dkt. 40 ("Br."); Dkt. 40-1 ("Def. SUF"); Dkt. 41 ("Dobson Decl."); Dkt. 42 ("Williams Decl."); Dkt. 43

("Plantilla Decl."). Plaintiff filed an opposition to the motion on January 8, 2026. *See* Dkt. 44 ("Pl. RSUF"); Dkts. 45-46; Dkt. 47 ("Opp."). The Times filed a reply on February 6, 2026. *See* Dkt. 50 ("Reply"); Dkts. 51-53.

The Times filed the parties' joint statement of undisputed facts pursuant to Local Rule 56.1 with its opening brief, *see* Dkt. 40-2, and then filed an amended joint statement with its Reply, *see* Dkt. 54-1 ("JSUF"). The amended statement is updated to include factual admissions that both parties made while briefing this motion and responding to each other's Rule 56.1 statements. *See* JSUF at 1 n.1. The Court deems the amended statement to be the operative joint statement of undisputed facts.

## II. Relevant Facts

The Court draws the following facts from the JSUF, as well as from the parties' separate statements of undisputed facts and the evidentiary record. Any citation to one party's statement of facts incorporates the other party's response.

### A. Sparks's Employment and Performance

The Times hired Sparks as a Product Manager on September 9, 2019. *Id.* ¶ 16. He worked in a department called "Subscription Growth Mission." *Id.* ¶ 18. From the second week of Sparks's employment through October 2022, his immediate supervisor was Kate Piselli ("Piselli"). *Id.* ¶ 20. As of October 2022, his immediate supervisor was Rokk-Vincelli Williams ("Williams"). *Id.* ¶ 23; *see* Dkt. 41-17 at 17:17-24; Williams Decl. ¶ 6. In August 2021, the Times promoted Sparks to Senior Product Manager. JSUF ¶ 21. Ben Cotton ("Cotton") became the head of Sparks's department the same month, and one year later Cotton was "promoted to senior vice president in that same role." Dkt. 41-9 at 7:14-21; *see* JSUF ¶ 19. Sparks understood that Cotton's "leadership style" emphasized team members taking ownership of their assignments, and that, given Cotton's promotion to a larger leadership role in the department in

2022, "it was imperative for [Sparks] to take leadership of all projects [his] team works on" in order "to work more effectively with [Cotton's] leadership style." Dkt. 41-6 ("Sparks Dep.") at 229:7-230:13; *see* JSUF ¶ 22.

The Times conducts annual performance reviews for its employees every November and assigns each of them a rating. JSUF ¶ 28. In 2022, that rating came from the following scale: "(1) Doesn't Meet Expectations, (2) Partially Meets Expectations, (3) Meets All Expectations, (4) Exceeds Various Expectations, (5) Frequently Exceeds Expectations, and (6) Substantially Surpasses Expectations." *Id.* ¶ 29. The Times's annual review process consists of managers "decid[ing] on an initial performance rating for each of their direct reports," followed by a "performance calibration process" in which "all managers of employees in a particular position meet to discuss the ratings to be issued to each employee in that position." Plantilla Decl. ¶¶ 13-14 (quotation marks omitted). At those meetings, known as calibration meetings, the "direct manager presents the proposed rating and the rationale," and the other managers "provide feedback regarding the rating based upon their experience with the employee being presented." *Id.* ¶ 15. The direct manager retains the discretion over the employee's final rating after the calibration meeting. *Id.* ¶ 16. It appears that the rating scale used in 2022 was also used in previous years — in 2019 and 2020, Sparks's rating was "exceeds various expectations," and in 2021 it was one level higher, "frequently exceeds expectations." JSUF ¶¶ 107-09.

Sparks's performance rating for 2022 was lower than in the preceding years. During a performance calibration meeting on January 5, 2023, Williams "advised the attendees that [he] intended to give Plaintiff a 'Meets All Expectations' rating for the 2022 review period." Williams Decl. ¶ 9. This was met with protest, however: A "heated debate ensued," in which Cotton and three others "challeng[ed] [Williams's] proposed . . . rating" and told him that "based on [his] presentation of [Sparks]'s performance and their own observations of [Sparks]'s

performance during the review period, a lower rating was warranted and more appropriate." *Id.* ¶ 10; *see also* Plantilla Decl. ¶¶ 22-23. Days later, after considering this feedback, Williams "assign[ed] Plaintiff a 'Partially Meets Expectations' rating for the 2022 calendar year." JSUF ¶ 40. According to the Times, such a rating "indicates that there are significant issues with someone's performance" and was given to only 2.2% of the Times's U.S. employees in 2022. Pl. RSUF ¶¶ 63-64 (citation omitted).

Williams's written performance review for Sparks that year included that Sparks "often failed to take accountability for his team's work," and that "stakeholders reported that he appeared disengaged in meetings and was difficult to obtain critical information from, including next steps, requirements, and support needs." JSUF ¶ 50; *see* Dkt. 41-28 at D001673 (describing Sparks's performance in the "second half" of 2022 as "a mixed bag" in which Sparks's display of "[e]nd to end ownership" was "a struggle"). Indeed, in an October 27, 2022 email, Sparks's former supervisor Piselli advised Sparks that he could improve his performance by "[t]ak[ing] full ownership of all projects [his] team works on." Dkt. 41-15 at D000900.

In late January or early February 2023, Williams decided to put Sparks on a performance improvement plan, also known as a PIP. Williams Decl. ¶ 14; Plantilla Decl. ¶ 27; *see* Dkt. 41-25 (the "PIP"). Williams's handwritten notes from that period reflect that he "moved forward on [a] draft" of the "Sparks PIP" on February 13, 2023. Dkt. 41-24; *see also* Dobson Decl. ¶ 26. Evidence submitted by the Times shows that Williams and Cotton discussed their revisions of a working draft of the PIP on February 27, 2023. *Compare* Dkt. 41-23 at D000919, *with* PIP at D000045 (both containing the line, "What was holding back an overall sense of [your] growth was Jira ticket and requirements gathering best practices" (alteration in original)).

On March 1, 2023, Sparks "told Williams for the first time that his wife was expecting a child and that he planned to take a leave of absence around the time the child was born." JSUF

¶ 46. He advised Williams that his wife was due "at the end of June" and that "he did not know the specific dates" of his anticipated leave, but that he "intended to take [that leave] intermittently," *id.* ¶ 47, with the second part "roughly around like Thanksgiving, Christmastime," Dkt. 46-2 ("Williams Dep.") at 126:4-5; *see id.* at 122:16-18, 125:18-126:6; JSUF ¶¶ 123-24. Sparks testified that he had not shared news of his wife's pregnancy with anyone at the Times before this. Sparks Dep. at 173:16-174:3. Williams responded, "[C]ongratulations, sounds good." JSUF ¶ 48. At some point that same month, Williams conveyed to Cotton that Sparks's "wife was expecting a child," and Cotton "assumed" that Sparks would take parental leave, though he did not recall Williams telling him so. *Id.* ¶ 49.

At a meeting on March 3, 2023, two days after Sparks told Williams about his wife's pregnancy, Williams advised Sparks that he would be placed on a PIP because of his "poor performance" in 2022. Pl. RSUF ¶ 79; *see also* Sparks Dep. at 240:13-21. The Times presented the PIP to Sparks on March 16, 2023. JSUF ¶ 51. The PIP "identified areas where [Sparks's] performance ha[d] been significantly below the expectations in [his] role as a Senior Product Manager," with particular focus on "[s]trategy & [e]xecution" and "[l]eadership & [c]ross [f]unctional [c]ollaboration." PIP at D000042, D000045; *see* JSUF ¶ 52. The PIP provided "[e]xamples of [u]nderperformance" in each of those areas, including that Sparks had needed "prod[ding] . . . on several occasions to develop a strategic document for [his] space"; that Sparks had given his teammates "incomplete" instructions and thus "left [them] in the dark" on a long-term project; that Sparks had failed to give a new hire "enough context for her to do her job well"; that there were "communication breakdowns between [Sparks] and [the new hire] that [Sparks], as the product lead, could have avoided"; and that Sparks had not followed through on his professed "interest in taking on informal leadership responsibilities." PIP at D000043-45. Moreover, the PIP noted that Sparks had shown an ability to "make positive changes" in his

performance, but that he "fail[ed] to maintain t[hem] and [he] often backslid[] into old bad habits." *Id.* at D000043. The PIP set objectives for Sparks's improvement, *see generally id.*, and was scheduled to run from March 17, 2023, to May 19, 2023, *id.* at D000042; *see* JSUF ¶ 57. Finally, the PIP contained the following warning:

> Should you meet the goals and objectives outlined in this [PIP], you will be considered to have completed this [PIP] but you will be expected to meet expectations on a sustained basis. Future failure to do so may result in further action, including possible termination of employment.

JSUF ¶ 56 (quoting PIP at D000046).

On May 22, 2023, after the PIP period had ended, Williams advised Sparks that he had "successfully completed" it. *Id.* ¶ 59. However, Williams had "provided [Sparks] with extensive guidance" in fulfilling his PIP obligations over the preceding weeks. Pl. RSUF ¶ 89.[1] Although the PIP stated that Williams and Sparks would meet weekly to "discuss [Sparks's] performance against [the PIP's] objectives," PIP at D000042, Sparks "insisted" that the two meet "every single day during the PIP period," for that purpose, Sparks Dep. at 274:25-275:21, and Williams agreed, *see* Pl. RSUF ¶ 88. Moreover, the Times's PIPs are generally "only 30 days" long, but Sparks's was longer to accommodate "a 'babymoon'" he planned to take "with his wife from

---

[1] Sparks admits this fact but "with the clarification that Williams agreed to be on top of [Sparks] with feedback and not to hold back while [he] was on the PIP." Pl. RSUF ¶ 89. Under Local Rule 56.1, each statement of fact set forth by the moving party "will be deemed to be admitted for purposes of the motion unless specifically *controverted* by . . . the opposing party" with "citation to evidence which would be admissible." Loc. Civ. R. 56.1(c)-(d) (emphasis added). Sparks fails to controvert a fact by admitting it and then offering additional evidence that merely "clarif[ies]" it, Pl. RSUF ¶ 89, rather than conflicting with it in any meaningful way. Accordingly, the Court deems this fact — and all others that Sparks similarly admits with non-conflicting clarification — admitted. *See Ali v. Szabo*, 81 F. Supp. 2d 447, 450 n.2 (S.D.N.Y. 2000) (deeming Rule 56.1 statements admitted where plaintiff "only 'objected to' or 'clarified' certain paragraphs of defendants' Rule 56.1 statement"); *see also Mar-Can Transp. Co. v. Local 854 Pension Fund*, 722 F. Supp. 3d 355, 358 n.1 (S.D.N.Y. 2024) ("Where a statement in a party's Rule 56.1 Statement is properly supported, and the other side does not specifically deny it with evidence, the statement is deemed admitted for purposes of this motion." (emphasis omitted)).

April 3rd through April 14th," during which time he "would be out of the office." JSUF ¶ 57; *see also* Williams Dep. at 177:5-13 (Williams testifying that he "extended the typical PIP duration . . . to make sure that [Sparks] could take that time [for the baby] and also come back and be fully able to work on the PIP"). In his message to Sparks notifying him that he had completed the PIP, Williams "commend[ed]" Sparks's "hard work and commitment to improvement" and noted Sparks's "willingness to take the feedback and make positive changes." Dkt. 41-30. Williams later testified, however, that "if [he] hadn't been meeting with Sparks every single day and going through a spreadsheet of all of the job actions he would need to take, that left to his own devices, he . . . likely would not have passed the PIP." Williams Dep. at 176:20-177:1. And while Williams's message to Sparks included that Williams and other managers "want[ed] [Sparks] to have continued success," he also stated that they would, "as always, continue to assess [Sparks's] performance as [they] move forward." Dkt. 41-30.

**B. The Times's Leave Policies and Sparks's Leave**

The Times maintains an FMLA policy "that provides job-protected leave to eligible employees and outlines the procedure for requesting [such] leave." JSUF ¶ 7; *see* Dkt. 41-3 (the "FMLA Policy"). Apart from the FMLA Policy, the Times has a "Parental Leave Policy that provides a minimum of 20 weeks of fully paid parental leave" followed by, if the employee desires, "an additional six weeks of unpaid parental leave." JSUF ¶¶ 9, 11; *see also* Dkt. 41-5 (the "Parental Leave Policy"). The Parental Leave Policy allows new parents (including "non-birth parents" like Sparks) to take their paid leave "continuously or on an intermittent basis." JSUF ¶ 10; *see* Parental Leave Policy at D000070 (providing that non-birth parent's leave "[n]eed not be consecutive but must be taken in one-week increments").

At the end of June 2023, Sparks told Williams that his wife had given birth to their child and that he would be taking parental leave. JSUF ¶¶ 115, 118. Sparks commenced his leave on

June 30, 2023. *Id.* ¶ 63. It was fully paid and lasted six weeks, until August 15, 2023. *Id.* ¶ 64. Williams did not "express any disapproval of" Sparks's planned leave, *id.* ¶ 118, and he "informed Cotton and others" of it, *id.* ¶ 122. After Sparks's child was born, Williams congratulated him and sent Times-branded infant apparel to Sparks's home. *Id.* ¶ 65.

### C. SLAYER and Sparks's Return to Work

One of Sparks's duties at the Times was a test project called SLAYER, which is an acronym standing for "Stay Longer At Your Existing Rate." Pl. RSUF ¶ 93. The Times offers individual subscriptions to its "news, cooking, and games" content, but "[t]here was a wider company strategy" to put users "on a single all[-]access subscription . . . to those three different products." Sparks Dep. at 286:6-14. SLAYER, part of that strategy, was a test consisting of "four rate change messages [that] would be shown to a different group of subscribers, offering each group a different method of upgrading their subscription." JSUF ¶ 70. The SLAYER test would display these messages, collect data about the subscribers' responses, compile that data on a dashboard, and ultimately allow the Times "to determine which rate change message was most effective" in convincing subscribers to upgrade. *Id.* ¶¶ 70-71.

As of June 2023, when Sparks commenced his leave, SLAYER was scheduled to launch in mid-July, before he had returned. *Id.* ¶ 63. Accordingly, Sparks testified, he completed his outstanding SLAYER-related tasks before leaving, "except for obtaining 'pricing details,' which he described as 'a rather trivial matter.'" *Id.* (quoting Sparks Dep. at 293:16-294:6); *see also* Sparks Dep. at 293:25-294:6 ("Q. Other than that piece with the pricing details[,] everything[] else that was your responsibility for your team was completed prior to you going out on leave in anticipation of this mid-July launch? A. Correct."). In fact, however, Williams learned after Sparks went on leave that Sparks had failed to provide "clear initial guidance" to his team on SLAYER's "technical approach," and the approach that Sparks "did set up contained multiple

shortcomings" that Williams, who oversaw SLAYER while Sparks was out, had to help Sparks's team "work through." Pl. RSUF ¶¶ 109-10; *see also* Dkt. 46-7 ("Cotton Dep.") at 90:14-91:15 (Cotton testifying that Williams assumed Sparks's SLAYER duties while Sparks was on leave and thus "was responsible for overseeing" the project and ensuring that "the team was able to continue with their work").

SLAYER did not launch as planned while Sparks was out. Instead, it launched August 23, 2023, eight days after Sparks had returned to work. JSUF ¶¶ 66, 68. At some point after the launch, but before September 11, 2023, Williams reviewed the SLAYER dashboard and noticed that there was no "meaningful difference in performance" between the four rate change messages. *Id.* ¶ 72. Cotton apparently reviewed the SLAYER dashboard around the same time; on September 12, 2023, he messaged Sparks and others noting his impression that "SLAYER is not doing well so far." Williams Decl., Ex. A at D000478. On September 14, 2023, Sparks responded to advise that he had "discovered" that all "test users who click on the slayer offer" were being redirected to an "ineligible error page," and thus "[n]o users ha[d] successfully purchased a slayer offer." *Id.* He provided the following explanation for this problem:

> As for how this happened, I am setting up a learning review and will provide a detailed synopsis afterwards. As this bug was missed by each of QA, product, engineering, and DIG across multiple teams, there isn't a single point of failure. We will provide a detailed set of recommendations to prevent this from occurring again.

*Id.*

SLAYER was relaunched on September 18, 2023, JSUF ¶ 75, "[a]fter Sparks and his team [had] fixed the issue," *id.* ¶ 149. Williams later estimated that "~80% of the audience in the test" received the error screen after attempting to upgrade their subscription, and that the Times lost over $140,000 during the three-week period that the "SLAYER experience was broken." Dkt. 41-38 at D000475-76.

### D. Sparks's Firing

On September 14, 2023, after receiving Sparks's explanation for the problem with SLAYER, Cotton messaged Hannah Yang (his own supervisor, *see* JSUF ¶ 139; Cotton Dep. at 38:4-6), describing Sparks as having made "the worst and most unacceptable mistake [he'd] ever seen," and stating that he "want[ed] to fire [S]parks immediately." Dkt. 41-34 at D002297. Cotton explained that the SLAYER "test had a massive bug" that "nobody caught . . . FOR A MONTH — something that looking at the dashboard for 30 seconds makes obvious." *Id.* at D002298. Indeed, the test data "was so obviously wrong" that Cotton's "first assumption, naively, was that . . . [he] must be looking at the wrong data or something." *Id.*[2] Yang agreed that Sparks had made an "egregious" mistake and confirmed with Cotton that it had followed "a short period of turning things around" after Sparks's previously "underperforming." *Id.* at D002298-99. Yang further opined that although this mistake in isolation may not be a fireable offense, "if it's a continuation of a pattern, I think this would tip it over." *Id.* at D002299. Cotton noted that he intended to "blow . . . up" Sparks's "whole team," but that Sparks himself was "obviously a core problem." *Id.*

In late September 2023, Williams, Cotton, and several others met "to discuss [Sparks]'s performance," and Williams decided afterward to fire Sparks. JSUF ¶¶ 76-77. Williams "maintained notes concerning the process leading up to" that firing. *Id.* ¶ 159; *see* Dkt. 46-12. These notes are not clearly dated, but they contain references to Sparks's failure to "maintain his performance from the PIP." *See* Dkt. 46-12 at D000471; *see also id.* at D000469 (noting that

---

[2] The test data was obviously wrong, Cotton later testified, because it indicated that very few users were taking the promotion offered to them "at a lower, more generous" rate; this result was contrary to the "ironclad" testing rule that "if the price is lower, more people are going to want to take that offer," and suggested to Cotton "that there was something fundamentally wrong" with SLAYER. Dkt. 41-9 at 43:3-44:16.

SLAYER issue was "only 4 months after [Sparks] successfully complet[ing] a PIP"); *id.* at D000470 ("There's separation given proximity to the [PIP]."). Under a heading labeled "Follow up," Williams wrote, "I need to come back with facts and timeline of the PIP, pat[ernity] leave, return and development and test issue finding." *Id.* at D000471; *see* JSUF ¶ 163. Further down the page, beneath an underscore, Williams wrote:

> Project was created (JIRA) for SLAYER in June 8[,] 2023
> SLAYER launch: 8/23
> SLAYER issue discovered: 9/13
> Partial pat Leave began: ~6/29
> Partial pat Leave End: ~8/15
> The PIP began: 3/17
> The PIP ended: 5/19

Dkt. 46-12 at D000471; *see* JSUF ¶ 164. Still further down, Williams wrote, "[r]iskier to raise a job elimination. Have wider latitude on the performance issue." Dkt. 46-12 at D000472; JSUF ¶ 165. Williams was unable to explain this final note at his deposition. JSUF ¶ 166.

Williams ultimately drafted a memorandum recommending Sparks's dismissal, citing his "continuous underperformance" in his role, including his low rating in 2022, the issuance of the PIP, and the problems with SLAYER. JSUF ¶¶ 78-80. With respect to SLAYER, Williams wrote that Sparks had shown that he "d[id] not have a command of the work that his team is producing," "d[id] not monitor his team's dashboards and performance indicators," and "[d]id not take accountability for the issue." *Id.* ¶ 80 (quoting Dkt. 41-38 at D000475). Williams and Cotton informed Sparks of the termination decision at a meeting on October 10, 2023. *Id.* ¶ 81. No one from the Times "ma[d]e any comments regarding [Sparks]'s need for an additional leave of absence" at that meeting. *Id.* ¶ 83.

On the same day, one of the Times's attorneys circulated an email to inform the recipients (whom the parties do not identify) with the news that Sparks "had been terminated and the reason for his termination was a disciplinary discharge." *Id.* ¶ 168; *see* Dkt. 46-16 at

D001372. Two days later, on October 12, 2023, Maria Plantilla — who worked in the Times's HR department, *see* Plantilla Decl. ¶ 3 — emailed Sparks and wrote that he "had been terminated because he had been on a performance improvement plan earlier that year and he had been unable to maintain a satisfactory level of performance." JSUF ¶ 169. Separately — in response to a request for information from Sparks's union, *see id.* ¶ 170; *see also id.* ¶ 17 — the Times stated that Sparks had been fired for "his failure to perform his work in a satisfactory and/or timely manner; his failure to proactively investigate problems in his work; his failure to engender the trust of his supervisors, team members and stakeholders; his failure to communicate with others about decisions and/or outcomes; his failure to collaborate with others; his failure to acknowledge his mistakes; his failure to improve his effectiveness and execution of his work; and his failure to demonstrate and/or develop leadership skills." *Id.* ¶ 170 (quoting Dkt. 46-18 at D001517). The Times also discussed the SLAYER issue in that correspondence and concluded that "[w]hile Mr. Sparks successfully passed the March 2023 PIP, after the PIP's completion Mr. Sparks immediately and egregiously failed to fulfill the basic goals, requirements and deliverables of a Senior Product Manager. As such, the [Times] terminated Mr. Spark[s]'s employment on October 10, 2023." Dkt. 46-18 at D001518.

Cotton is unaware of any other Times employee disciplined or fired in connection with the SLAYER test issue. JSUF ¶¶ 176-77. Although Cotton believed that Williams "could have checked the SLAYER dashboard sooner to catch the issue" himself, *id.* ¶ 174, he gave Williams only "some informal feedback" regarding how he "could have handled it," and he did not discipline Williams, *id.* ¶ 173.

## LEGAL STANDARD

### I. Summary Judgment

Under Federal Rule of Civil Procedure ("Rule") 56, a court may grant summary judgment on any claim or defense where the moving party "shows that there is no genuine dispute as to any material fact and the [party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A material fact is one that would 'affect the outcome of the suit under the governing law,'" and thus "[f]actual disputes that are irrelevant or unnecessary will not be counted." *Tarpon Bay Partners LLC v. Zerez Holdings Corp.*, 79 F.4th 206, 220-21 (2d Cir. 2023) (first quoting *Aetna Life Ins. Co. v. Big Y Foods, Inc.*, 52 F.4th 66, 72 (2d Cir. 2022); and then quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1987)). A genuine dispute is one in which "the evidence is such that a reasonable factfinder could return a verdict for the nonmoving party." *Id.* at 220 (alteration adopted) (quoting *Aetna*, 52 F.4th at 72). On such a motion, the Court "constru[es] the evidence in the light most favorable to the [nonmoving party] . . .[,] drawing all reasonable inferences and resolving all ambiguities in [his] favor." *Jaffir v. Hirji*, 887 F.3d 111, 114 (2d Cir. 2018) (second and final alteration in original) (quoting *Darnell v. Pineiro*, 849 F.3d 17, 22 (2d Cir. 2017)).

At summary judgment, "the court should not weigh evidence" or "cho[ose] between conflicting versions of the events." *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005); *accord Dodd v. City Univ.*, 489 F. Supp. 3d 219, 261 (S.D.N.Y. 2020). Even so, "[a] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)). And "[w]hen no rational jury could find in favor of the nonmoving party because the evidence to support its case is so

slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).

## II. The FMLA

The FMLA allows eligible employees to take up to twelve "workweeks" of unpaid leave per year for the purposes specified in the statute, including "[b]ecause of the birth of a son or daughter of the employee and in order to care for such son or daughter." 29 U.S.C. § 2612(a)(1)(A). Under the FMLA, it is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." *Id.* § 2615(a)(1). Accordingly, the Second Circuit recognizes FMLA claims "in at least two varieties: interference and retaliation." *Woods v. START Treatment & Recovery Ctrs., Inc.*, 864 F.3d 158, 166 (2d Cir. 2017); *accord Tieu v. N.Y.C. Econ. Dev. Corp.*, 717 F. Supp. 3d 305, 326 (S.D.N.Y. 2024). The Second Circuit has explained those varieties as follows:

> In a general sense, an employee brings an "interference" claim when her employer has prevented or otherwise impeded the employee's ability to exercise rights under the FMLA. "Retaliation" claims, on the other hand, involve an employee actually exercising her rights or opposing perceived unlawful conduct under the FMLA and then being subjected to some adverse employment action by the employer. The two types of claims serve as *ex ante* and *ex post* protections for employees who seek to avail themselves of rights granted by the FMLA.

*Woods*, 864 F.3d at 166 (citations omitted).

# DISCUSSION

Sparks alleges that the Times interfered with his FMLA rights by firing him — because his termination both effectively denied him reinstatement to his pre-leave position and prevented him from taking the second half of his planned intermittent leave — and, by the same action, retaliated against him for exercising his FMLA rights. *See* Compl. ¶¶ 56-59, 61-63. He further contends that the Times discriminated against him based on his caregiver status, in violation of the NYCHRL. *Id.* ¶¶ 67-69. The Times moves for summary judgment on all these claims,

contending that it fired Sparks solely for ongoing performance issues that initially arose before the Times knew of Sparks's anticipated FMLA leave. *See* Br. at 1. The Court addresses Sparks's claims in turn.

## I. The FMLA Claims

The Court begins with the FMLA claims, taking the retaliation claim first.

### A. FMLA Retaliation

"[Courts] analyze an FMLA retaliation claim 'under the burden-shifting test set forth in *McDonnell Douglas*.'" *Haran v. Orange Bus. Servs., Inc.*, 160 F.4th 51, 58 (2d Cir. 2025) (quoting *Graziadio v. Culinary Inst.*, 817 F.3d 415, 429 (2d Cir. 2016)). Under that standard, a plaintiff's initial burden is to "establish that 1) he exercised rights protected under the FMLA; 2) he was qualified for his position; 3) he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." *Graziadio*, 817 F.3d at 429 (quoting *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 147 (2d Cir. 2012)); *accord Haran*, 160 F.4th at 58-59. If the plaintiff carries that initial burden, then the employer "must demonstrate a legitimate, nondiscriminatory reason for its actions; if the [employer] does so, the plaintiff must then show that [the employer]'s proffered explanation is pretextual." *Haran*, 160 F.4th at 59 (quoting *Graziadio*, 817 F.3d at 429). At the pretext stage of the *McDonnell Douglas* framework, a plaintiff succeeds "'by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered' reason, or by providing evidence such that a reasonable factfinder could conclude that the prohibited reason was a 'motivating factor' in the adverse employment action." *Greenberg v. State Univ. Hosp. - Downstate Med. Ctr.*, 838 F. App'x 603, 606 (2d Cir. 2020) (summary order) (citation omitted) (first quoting *Graziadio*, 817 F.3d at 430; and then quoting *Woods*, 864 F.3d at 168-69).

Courts often refer to *McDonnell Douglas*'s burden-shifting framework as "familiar." *See, e.g.*, *Tafolla v. Heilig*, 80 F.4th 111, 118 (2d Cir. 2023). Its familiarity comes from its use in evaluating employment discrimination and retaliation claims brought under a wide range of federal and state statutes. *See, e.g.*, *Bey v. City of New York*, 999 F.3d 157, 165 (2d Cir. 2021) ("Like many other discrimination claims, ADA claims are subject to the burden-shifting framework articulated in *McDonnell Douglas*[.]"); *Tafolla*, 80 F.4th at 118 (applying *McDonnell Douglas* to claims for failure to provide reasonable accommodations under ADA and NYSHRL); *Carr v. N.Y.C. Trans. Auth.*, 76 F.4th 172, 178 (2d Cir. 2023) ("[T]he *McDonnell Douglas* framework applies to retaliation claims, whether brought under the ADEA, Title VII, or Section 1981."). Because *McDonnell Douglas* imposes the same prima facie burden on all plaintiffs, regardless of the specific statute under which they bring their claims, courts often analyze all *McDonnell Douglas* claims together, *see, e.g.*, *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106-07 (2d Cir. 2010) (analyzing employment discrimination claims under Title VII, § 1981, the Equal Protection Clause, and NYSHRL together because "[t]he substantive standards" under each are the same), and at times rely on case law from one *McDonnell Douglas* discrimination statute in analyzing another, *see, e.g.*, *Palmer v. eCapital Corp.*, No. 23-cv-04080 (DEH), 2024 WL 3794715, at *7 n.5 (S.D.N.Y. Aug. 13, 2024) (explaining that the court would "cite[] both Title VII and Section 1981 caselaw" in analyzing plaintiff's Title VII claim because "[c]ourts apply the same standards" to claims under both statutes); *Cadet v. Alliance Nursing Staffing of N.Y., Inc.*, 632 F. Supp. 3d 202, 222-23 (S.D.N.Y. 2022) (similar). The Court will take the same approach here, in part. Notably, the FMLA diverges from some other discrimination statutes at the pretext stage of the *McDonnell Douglas* framework: Some statutes require that discrimination be the but-for cause of the adverse employment action, whereas the FMLA imposes a less stringent "motivating factor" standard. *See Carter v. TD Bank, N.A.*, No. 23-950,

2024 WL 2828470, at *4 (2d Cir. June 4, 2024) (summary order) ("Like Title VII discrimination claims — and unlike ADA discrimination and Title VII retaliation claims — FMLA retaliation claims are subject to the more lenient 'motivating factor' causation standard." (citation omitted)). Accordingly, throughout this Opinion, the Court will at times rely on cases concerning non-FMLA statutes subject to *McDonnell Douglas* where those cases analyze the plaintiff's burden to establish an inference of retaliation at the prima facie stage, but the Court will only rely on non-FMLA cases analyzing a plaintiff's burden at the pretext stage where the statute at issue uses the same "motivating factor" standard.

With these principles in mind, the Court turns to the Times's motion. The Times seeks summary judgment on Sparks's FMLA retaliation claim because, it argues, (1) Sparks did not exercise his rights under the FMLA, and thus he cannot establish the first element of his prima facie case, Br. at 19-22; (2) Sparks has not shown that his termination gives rise to an inference of retaliatory intent, and thus he cannot establish the fourth element of his prima facie case, *id.* at 22-23; and (3) even if Sparks had established his prima facie case, the Times fired him for a legitimate reason (his poor performance), and Sparks cannot demonstrate that this reason is pretextual, *id.* at 23-25. The Court agrees with the Times on its second and third arguments and, therefore, need not address the first.

In opposing the Times's motion, and in arguing that he has met his burdens both at the first (prima facie) and third (pretext) stages of the *McDonnell Douglas* framework, Sparks points to various pieces of evidence that he says raise triable issues of fact. The Court, addressing each piece of evidence below, holds that the Times is entitled to judgment as a matter of law on Sparks's FMLA retaliation claim because no reasonable jury could find, on the undisputed facts, that Sparks's termination gives rise to an inference of retaliatory intent or, even assuming his

termination did give rise to such an inference, that the Times's proffered explanation for his termination is pretextual.

*1. The PIP*

In arguing that his firing gives rise to an inference of retaliatory intent, Sparks first points to the "close temporal proximity" between his initial disclosure of his intent to take FMLA leave and the Times's decision to place him on the PIP. *See* Opp. at 15. But Sparks's PIP and termination are two distinct occurrences, and it is well settled that PIPs are not adverse employment actions unless they are accompanied by some other negative result such as a demotion or decrease in pay. *See, e.g.*, *Brown v. Am. Golf Corp.*, 99 F. App'x 341, 343 (2d Cir. 2004) (summary order) (finding that "being instructed to follow the requirements of the Performance Improvement Plan did not constitute an adverse employment action" where it created no "materially adverse . . . change in [plaintiff's] working conditions" (internal quotation marks omitted) (quoting *Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000))); *accord Cale v. Mount Sinai Bus. Health*, No. 23-cv-03072 (RA), 2025 WL 919478, at *6 (S.D.N.Y. Mar. 26, 2025); *Pasquarello v. Crothall Healthcare, Inc.*, No. 21-cv-08732 (JLR), 2023 WL 5714165, at *8 (S.D.N.Y. Sept. 5, 2023). No such other negative results are alleged here, let alone established, and accordingly Sparks does not move the needle on his retaliation claim by connecting his leave and the PIP. *See Graziadio*, 817 F.3d at 429 (providing that FMLA retaliation plaintiff must establish that "the *adverse employment action* occurred under circumstances giving rise to an inference of retaliatory intent" (emphasis added)).

To the extent Sparks means to suggest that the PIP was merely a step towards his ultimate retaliatory termination, he disingenuously recounts the sequence of events leading up to the PIP. He argues the Times placed him on a PIP on March 3, 2023, just two days after he first told Williams that his wife was pregnant. Opp. at 16. That is accurate in part, but it omits the record

evidence — which Sparks has not refuted — that Williams *decided* to put him on a PIP at least one month earlier, in January or February 2023, and began drafting the PIP around that time. *See* Williams Decl. ¶ 14; Plantilla Decl. ¶ 27; Dkt. 41-24 (Williams's handwritten notes dated February 13, 2023, regarding his "draft" of the "Sparks PIP"); Dkt. 41-23 (messages between Williams and Cotton dated February 27, 2023, discussing revisions to the draft PIP). Moreover, Sparks himself testified that he had not told anyone at the Times about his wife's pregnancy before telling Williams on March 1, 2023. Sparks Dep. at 173:16-174:3. Sparks may wish to ignore these facts and focus only on the date he received the PIP, *see* Opp. at 15, 17, but no reasonable jury could do the same. *See, e.g.*, *Szarzynski v. Roche Lab'ys, Inc.*, No. 07-cv-06008, 2010 WL 811445, at *14 (W.D.N.Y. Mar. 1, 2010) (finding no inference of retaliation, and granting summary judgment to employer, where "complaints regarding plaintiff's performance began as early as March 2005 and continued through his mid-year evaluation and PIP, *all before* he [engaged in protected activity] in November 2005").

Sparks also appears to suggest that he never should have been placed on the PIP, because the PIP was based on his 2022 performance review, and his manager for most of that year, Piselli, "would have given [him] a 'meets expectations' rating." Opp. at 17. The argument is both factually misleading and legally irrelevant. To begin, Sparks subtly mischaracterizes Piselli's testimony. She testified, after reviewing the October 2022 email she had sent to Sparks regarding his performance, that she could not "say from memory what [her] thoughts" had been about Sparks's performance at that time, but that based on her review of the email she "d[id]n't know that [she] would have said partially meets expectations"; after repeatedly stating that she "d[id]n't know what [she] would have said" instead, Piselli testified that she "*might* have said meets, higher." Dkt. 46-4 at 39:12-40:4 (emphasis added). Piselli's testimony about what she *might* have said is not the same as testimony about what she *would* have said. Moreover, even if

Piselli had definitively testified that she would have given Sparks a higher performance rating, "the central issue is whether [the Times] had adequate, non-discriminatory grounds to terminate [Sparks] based on their view of his performance, and not whether, for example, a different manager might have believed that . . . [Sparks] was doing an adequate job." *Borzon v. Green*, No. 16-cv-07385 (VEC), 2018 WL 3212419, at *11 (S.D.N.Y. June 29, 2018) (granting summary judgment on Title VII discrimination claim), *aff'd*, 778 F. App'x 16 (2d Cir. 2019) (summary order).[3] Finally, to the extent Sparks believes his 2022 performance rating should have been higher, and even if Piselli's testimony supported that belief, "[m]ere 'disagreement with an employer's evaluation of an employee's performance is insufficient to establish discriminatory intent' because 'disagreements do not, as a matter of law or logic, mean that present poor performance reviews are unfounded.'" *Brenner v. City of N.Y. Dep't of Educ.*, 132 F. Supp. 3d 407, 418 (E.D.N.Y. 2015) (alterations and omissions adopted) (quoting *Mattera v. JPMorgan Chase Corp.*, 740 F. Supp. 2d 561, 576 (S.D.N.Y. 2010)), *aff'd*, 659 F. App'x 52 (2d Cir. 2016) (summary order). In any event, Sparks's 2022 rating was finalized well before he had told anyone at the Times that his wife was pregnant, let alone that he planned to take FMLA leave. *Compare* JSUF ¶ 43 (Sparks's 2022 rating was finalized in January 2023), *with id.* ¶ 46 (Sparks first informed Williams of wife's pregnancy in March 2023), *and* Sparks Dep. at 173:16-

---

[3] The Court relies on discrimination and retaliation case law in equal parts, because "[r]etaliation is, by definition . . . a form of discrimination." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173-74 (2005) (quotation marks omitted) (explaining that Title IX's prohibition of sex discrimination also covered retaliation); *see Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 82 (2d Cir. 2015) (extending *Jackson*'s logic to Section 1983 discrimination claims, because its "reasoning applies with equal force to the employment context"); *Baptiste v. City Univ.*, 680 F. Supp. 3d 415, 425 n.3 (S.D.N.Y. 2023) (relying "both on cases that discuss disability-based discrimination generally and those that discuss disability-based retaliation specifically" because "the Second Circuit has made clear that 'retaliation is a form of discrimination'" (quoting *Vega*, 801 F.3d at 82)); *Oliver Cyrus v. Lockheed Martin Corp.*, No. 22-cv-04115 (AMD) (TAM), 2025 WL 964016, at *6 (E.D.N.Y. Mar. 31, 2025) (analyzing "discrimination and retaliation claims together because they are governed by the *McDonnell Douglas* burden-shifting framework").

174:3 (Sparks's testimony that he had not told anyone at the Times about wife's pregnancy before Williams).

*2. Williams's August 25, 2023 Message*

Sparks next points to an August 25, 2023 message that Williams sent to another Times employee, Megan Elliott, in which Williams stated he had his "hands full with Sparks." Opp. at 16 (quoting Pl. RSUF ¶ 216). Sparks presents this statement without context, but Williams and Elliott were discussing a former Times employee who was interested in applying for an open position at the Times. *See* Dkt. 46-30 at D002337. After some back and forth, Williams wrote, "From what Ive heard I dunno if i would want to manage jack. Ive got my hands full with Sparks[.]" *Id.* (all errors *sic*). Sparks contends that, because he had "performed his work as anticipated and consistent with the PIP" leading up to his leave, and because Williams had not documented any performance issues after his return from leave in August 2023, "it is reasonable to infer" that this comment was "due to retaliatory intent." Opp. at 16. No reasonable jury could adopt this conclusory surmise.

Even taking Williams's statement in isolation, as Sparks presents it, nothing on its face connects (or even refers) to Sparks's FMLA leave or becoming a parent, and therefore nothing on its face suggests retaliatory intent. *See, e.g.*, *Haran*, 160 F.4th at 59 (holding that district court "correctly rejected [plaintiff]'s assertion that [supervisor]'s criticisms related to her [FMLA] leave" where supervisor made "negative comments about [plaintiff's] lack of focus" (internal quotation marks and citation omitted));[4] *Barbini v. First Niagara Bank N.A.*, No. 16-cv-

[4] This finding in *Haran* was part of the Second Circuit's analysis of whether the plaintiff had met her burden to show that her employer's proffered basis for firing her was pretextual, *Haran*, 160 F.4th at 59, not whether she had established her prima facie case. For purposes of this motion, however, there is no significant difference between the two, because "issues of this nature tend to collapse as a practical matter under the *McDonnell Douglas* framework." *Collins v. N.Y.C. Transit Auth.*, 305 F.3d 113, 118 n.1 (2d Cir. 2002); *accord Edwards v. Noem*, No. 23-cv-06942

07887 (NSR), 2022 WL 623184, at *20-21 (S.D.N.Y. Mar. 3, 2022) (finding no inference of age discrimination where supervisor told plaintiff he wanted to "take[] her to the shed" and called plaintiff at work before 9:00 a.m. to ask "if she was asleep," because "the record contain[ed] no evidence supporting an inference that [either phrase] [wa]s so closely associated with employees over the age of 40 so that a reasonable jury could find discriminatory animus" (alterations adopted)); *Edwards v. Noem*, No. 23-cv-06942 (VF), 2026 WL 861558, at *8 (S.D.N.Y. Mar. 30, 2026) (finding no inference of race or gender discrimination where defendant, referring to a Black woman who had performed poorly on a task, said, "[W]ell, we knew she was going to do that. I don't know why she showed up here," because "[o]n its face, . . . the comment [wa]s race and gender neutral" (citation omitted)); *cf. Graham v. N.Y.C. Dep't of Educ.*, No. 21-cv-06885 (WFK) (LB), 2025 WL 872221, at *7 (E.D.N.Y. Mar. 20, 2025) (holding, at motion-to-dismiss stage, that "[c]ritical, but facially neutral, remarks do not raise an inference of discrimination unless accompanied by specific evidence of discriminatory intent").

Moreover, the undisputed facts and evidence, alongside the full context of Williams's and Elliott's conversation, all but foreclose the inference Sparks urges. For one, the record establishes that Sparks had not performed in accordance with the PIP for the entirety of the time leading up to his leave. Sparks does not dispute that, before going out on leave, he failed to "provide[] clear initial guidance on the technical approach for [SLAYER], leaving [his] team uncertain about how to proceed." Pl. RSUF ¶ 109. And Sparks's PIP explicitly noted that Sparks had previously given his teammates "incomplete" instructions and thus "left [them] in the

---

(VF), 2026 WL 861558, at *6 (S.D.N.Y. Mar. 30, 2026). Evidence that supports or undercuts an inference of retaliatory intent will, likewise, support or undercut Sparks's contention that the Times's proffered reason for his termination was mere pretext. As discussed previously, however, the Court will not similarly collapse non-FMLA caselaw when analyzing Sparks's claims, and will not rely on non-FMLA pretext cases in analyzing any part of those claims.

dark" on a long-term project, and it therefore informed Sparks that he "need[ed] to plan ahead enough to give [his] team a sense of shared goals and a rough idea of how [he and the team] will all accomplish them." PIP at D000044. In addition, Piselli's October 27, 2022 email — which Sparks concedes the Times "used . . . to later justify the PIP," Opp. at 17; *see* PIP at D000042 (including hyperlink to "Feedback October 27, 2022") — emphasized the importance of "tak[ing] leadership of all projects," JSUF ¶ 22; Dkt. 41-15 at D000900. And while Sparks ultimately fixed the SLAYER bug, *see* JSUF ¶ 149, he initially informed Williams and Cotton that "th[e] bug was missed by each of QA, product, engineering, and DIG across multiple teams, [so] there isn't a single point of failure," Williams Decl., Ex. A at D000478. Sparks further does not dispute that, although he testified that he had taken care of all his SLAYER responsibilities prior to his leave, *see* JSUF ¶ 63, Williams discovered "multiple shortcomings" in what Sparks had put in place and had to correct them while Sparks was out, Pl. RSUF ¶ 110. Moreover, Sparks himself testified that Williams had met with him "every single day during the PIP period" to measure Sparks's progress against the PIP's objectives, Sparks Dep. at 274:25-275:21; *see* Pl. RSUF ¶ 88, and he does not dispute that his PIP period was longer than usual to accommodate a "babymoon" he had planned with his wife, JSUF ¶ 57. No reasonable jury could infer, from these undisputed facts, that Williams's comment to Elliott evinces a plan to fire Sparks for taking FMLA leave rather than a complaint that managing Sparks was time-consuming and onerous. *See Olorode v. Steamingedge, Inc.*, No. 11-cv-06934 (GBD) (AJP), 2014 WL 1689039, at *15 (S.D.N.Y. Apr. 29, 2014) (drawing no inference of discriminatory intent where, "based on the context of the entire instant message conversation, there is no evidence that the comment was made in reference to [plaintiff]'s race or national origin"), *report and recommendation adopted*, 2014 WL 3974581 (S.D.N.Y. Aug. 13, 2014); *cf. Philippe v. Santander Bank, N.A.*, No. 15-cv-02918 (MKB) (CLP), 2018 WL 1559765, at *4, *12 (E.D.N.Y. Mar. 31, 2018) (finding that

plaintiff failed to establish pretextual termination under FMLA where "[a]lmost all" of supervisor's comments about plaintiff — such as that he "was 'a joke' and failed to hold his employees accountable" — "indicate[d] that any animus was directed at [p]laintiff's poor performance rather than the exercise of his rights under the FMLA"). Indeed, in opposition to this record evidence, Sparks offers only his own speculation as to the hidden meaning of Williams's comment, and that is not nearly enough. *See Conroy v. N.Y. State Dep't of Corr. Servs.*, 333 F.3d 88, 94 (2d Cir. 2003) ("Mere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment." (alteration adopted) (quoting *Cifarelli v. Vill. of Babylon*, 93 F.3d 47, 51 (2d Cir. 1996)).

*3. Timing of Sparks's Termination*

Finally, Sparks argues that the Times fired him "[a]pproximately two and one-half months after [he] went on leave, and one month after [he] returned from leave," and he contends that this gives rise to an inference of retaliatory intent. Opp. at 16.[5] To be sure, "[c]lose temporal proximity between the plaintiff's protected action and the employer's adverse employment action *may* in itself be sufficient to establish the requisite causal connection between a protected activity and retaliatory action." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010) (emphasis added). But temporal proximity is insufficient here in light of the

[5] It is not clear to the Court why Sparks approximated this timeline when the dates in question are in the record and undisputed, and still less clear to the Court how Sparks reached these purported approximations. His leave began June 30, 2023, JSUF ¶ 63, he returned to work on August 15, 2023, *id.* ¶ 64, and he was fired on October 10, 2023, *id.* ¶ 81. The Court takes judicial notice of the fact that October 10, 2023, is 103 days (that is, over three months — not approximately two-and-a-half) after June 30, 2023, and that it is 56 days (that is, nearly two months — not approximately one) after August 15, 2023. *See, e.g.*, *Rubenstein v. Cosmos Holdings, Inc.*, No. 19-cv-06976 (KPF), 2020 WL 3893347, at *7 n.8 (S.D.N.Y. July 10, 2020) (taking judicial notice of "the accurate duration between . . . dates" given plaintiff's inaccurate calculation). As the Court's analysis will make clear, this is ultimately a distinction without a difference, but the Court notes it nonetheless to ensure that the record is accurate.

ample record evidence of Sparks's poor job performance, which began before Sparks took FMLA leave or even notified anyone at the Times that his wife was pregnant, and which included the SLAYER problems upon his return, contemporaneously described by Cotton as "the worst and most unacceptable mistake [he'd] ever seen." Dkt. 41-34 at D002297. *See Franco v. Am. Airlines, Inc.*, No. 21-cv-05918 (JGLC) (JW), 2024 WL 1054865, at *7, *18 (S.D.N.Y. Feb. 16, 2024) (finding no inference of retaliatory intent where plaintiff was fired one week after submitting FMLA request, but had received final warning letter regarding job performance one month before, and "HR personnel exchanged emails about the decision to terminate [him]" before receiving his FMLA request), *report and recommendation adopted*, 2024 WL 4524614 (S.D.N.Y. Oct. 18, 2024); *Lievre v. JRM Constr. Mgmt., LLC*, No. 17-cv-04439 (BCM), 2019 WL 4572777, at *18-19 (S.D.N.Y. Sept. 20, 2019) (granting summary judgment to employer on FMLA claim where plaintiff "submitted no evidence of any kind, direct or indirect — other than the timing of his termination — suggesting that his past and/or potential future requests for FMLA leave were a 'negative factor' in [employer]'s decision to terminate him"); *see also Haran*, 160 F.4th at 59 ("[T]emporal proximity alone is insufficient to defeat summary judgment at the pretext stage." (quoting *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 847 (2d Cir. 2013))); *Matias v. Montefiore Med. Ctr.*, No. 20-cv-02849 (VEC), 2022 WL 4448585, at *16-17 (S.D.N.Y. Sept. 23, 2022) (granting summary judgment to employer where plaintiff's termination two weeks after submitting FMLA request was "sufficient to allow the [c]ourt to infer retaliatory intent," but where it was undisputed that employer decided to fire her after she had sent an insubordinate email, which "punctuated a history of" her other performance issues, and thus "the undisputed evidence show[ed] that the termination decision was legitimate and non-retaliatory"); *cf. Blodgett v. 22 S. St. Operations, LLC*, 828 F. App'x 1, 5 (2d Cir. 2020) (summary order) ("Even assuming that [plaintiff] has established a *prima facie* case, she has

done nothing more than show a tenuous temporal connection between her request for FMLA leave — which occurred after [a previous adverse employment action] — and her termination.").

*4. Sparks's Evidence of Pretextual Termination*

Finally, Sparks points to various pieces of evidence that, he says, demonstrate that the Times's stated reason for his termination (his ongoing poor performance) was pretextual. *See* Opp. at 18-21. Even assuming that Sparks succeeded in establishing his prima facie case — which, as discussed above, he has not — the Court finds that no reasonable jury could agree with Sparks on pretext based on the undisputed facts.

Sparks first contends that the Times gave "[s]hifting and somewhat inconsistent explanations for [his] termination." *Id.* at 19. The record does not support this characterization. The Times's justifications were that (1) Sparks's termination was a "disciplinary discharge," JSUF ¶ 168; (2) Sparks had been fired for his inability "to maintain a satisfactory level of performance" after the PIP, *id.* ¶ 169; and (3) Sparks had been fired for, among other performance-related reasons, "his failure to perform his work in a satisfactory and/or timely manner; his failure to proactively investigate problems in his work; [and] his failure to engender the trust of his supervisors, team members and stakeholders," *id.* ¶ 170 (quoting Dkt. 46-18 at D001517). These are "variations, if that, on the same theme rather than separate inconsistent justifications." *Roge v. NYP Holdings*, 257 F.3d 164, 170 (2d Cir. 2001). Indeed, these explanations all generally relate to Sparks's performance, and "in order to infer pretext for a retaliatory motive from multiple justifications, a defendant's nonretaliatory justifications must be not merely different, but inconsistent with one another." *Samuels v. Urb. Assembly Charter Sch. for Comput. Sci.*, No. 23-cv-01379 (RA), 2025 WL 1785847, at *7 (S.D.N.Y. June 26, 2025) (quoting *Richardson v. Bronx Lebanon Hosp.*, No. 11-cv-09095 (KPF), 2014 WL 4386731, at *16 (S.D.N.Y. Sept. 5, 2014)); *cf. Giaccio v. Michael Anthony Contracting Corp.*, No. 19-cv-

04492 (DRH) (ARL), 2022 WL 815931, at *9 (E.D.N.Y. Feb. 16, 2022) (finding that employer's reasons for termination "[we]re not materially inconsistent . . . [and] d[id] not support pretext" under ADEA's stricter but-for standard where employer explained that it had fired plaintiff "due to his performance, citing his errors in bids and inability to follow company policy" and, additionally, "because of streamlining the department, . . . mean[ing] getting more productive individuals" as well as plaintiff's "insubordination," which all "f[e]ll under the general umbrella of performance issues").

Sparks also asserts that "Williams is an appropriate comparator" to him because he "stepp[ed] into [Sparks]'s shoes during [Sparks]'s leave," yet Williams did not have children at the time or take FMLA leave — and Williams, Sparks emphasizes, was not fired after the SLAYER debacle. Opp. at 19. No reasonable jury could find that this demonstrates, or even suggests, pretext. A "comparator must be similarly situated to the plaintiff 'in all material respects,'" *Radwan v. Manuel*, 55 F.4th 101, 132 (2d Cir. 2022) (quoting *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 494 (2d Cir. 2010)), and Williams and Sparks are not similarly situated. First, Williams was Sparks's direct supervisor. *See, e.g.*, *Eugene v. City of New York*, No. 25-cv-06173 (LJL), 2026 WL 1831351, at *9 n.4 (S.D.N.Y. June 25, 2026) ("Plaintiff's direct supervisor is not, by virtue of his or her position, a similarly situated comparator[.]"). Second, there is no evidence in the record that Williams had a history of performance issues similar to Sparks's, such as a low annual rating or a PIP. *See, e.g.*, *Goldzweig v. Consol. Edison Co. of N.Y., Inc.*, No. 25-0089-cv, 2026 WL 21005, at *2 (2d Cir. Jan. 5, 2026) (summary order) (holding that "the comparators [plaintiff] identifie[d] [we]re not similarly situated to her in all material respects as they d[id] not have comparable histories of documented performance deficiencies" (alteration adopted) (internal quotation marks omitted)); *Burgess v. New Sch. Univ.*, No. 23-cv-04944 (JGK), 2024 WL 4149240, at *10 (S.D.N.Y. Sept. 11, 2024) ("[T]he

history of critical comments about [plaintiff]'s performance over the years distinguishes [plaintiff]'s record from that of [plaintiff]'s two alleged comparators."); *Henry v. McDonald*, 531 F. Supp. 3d 573, 586 (E.D.N.Y. 2021) ("Plaintiff fails to identify . . . any comparators who experienced similar performance problems, but received more favorable treatment than he."). Third, Sparks's own testimony was that he completed all major SLAYER tasks before commencing his leave — Williams, then, stepping into Sparks's shoes in his absence, should have had very little to do on the project, yet he still uncovered various mistakes Sparks had made before leaving, *see* Pl. RSUF ¶¶ 109-10, and the problems with SLAYER emerged after Sparks had returned from leave and relieved Williams of his temporary responsibility over the project, JSUF ¶¶ 66, 68, 136. "In the context of employee discipline, . . . the plaintiff and the similarly situated employee must have 'engaged in comparable conduct,' that is, conduct of 'comparable seriousness,'" *Raspardo v. Carlone*, 770 F.3d 97, 126 (2d Cir. 2014), and no reasonable jury could find that Williams and Sparks were equally responsible for SLAYER's failure based on Williams's temporary assumption of the duties for which Sparks was otherwise "solely responsible." Pl. RSUF ¶ 97.[6]

Lastly, Sparks contends that Williams's notes from meetings discussing Sparks's termination — in which Williams reminded himself "to come back with facts and timeline of the PIP, pat[ernity] leave, return and development and test issue finding"; subsequently set forth that exact timeline; and wrote, "[r]iskier to raise a job elimination. Have wider latitude on the performance issue," Dkt. 46-12 at D000471-472; *see* JSUF ¶¶ 163-65 — demonstrate that the Times "consider[ed] [Sparks]'s exercise of FMLA leave when deciding whether to terminate

[6] Sparks also contends that certain members of the Times's QA team shared blame for SLAYER but were not fired, and indeed neither was any other Times employee. Opp. at 21. Sparks provides no information that would permit the Court to determine whether these other employees are valid comparators, especially with respect to their performance history.

[him] and what reason for termination would provide the best cover." Opp. at 20; *see also id.* ("[I]t is reasonable to infer [the Times]'s consciousness of guilt and that it was searching for the best cover-up for its unlawful termination of [Sparks] due to his exercise of FMLA rights."). But while the law prohibits the Times from using Sparks's FMLA leave as a motivating factor in firing him, *Woods*, 864 F.3d at 166, it does not prohibit the Times from merely acknowledging the fact of his FMLA leave — and, therefore, the dates he was present at work — when discussing his termination. On their face, that acknowledgment is all Williams's notes show, and Sparks has not cited a single case holding that such an acknowledgment is evidence of pretext sufficient to withstand summary judgment. *See* Opp. at 20; *see also Philippe*, 2018 WL 1559765, at *3-4, *12 (finding no evidence of pretext where supervisor discussed with HR the possibility of transferring plaintiff while he was on FMLA leave and, separately, commented to another employee "that he felt that [p]laintiff was 'making it up' and 'just taking time off,'" because "the mere fact that [supervisor and employer] *considered* terminating [p]laintiff during his FMLA leave is insufficient to demonstrate pretext," and explaining that "[r]ather than assuming that all negative actions or considerations during FMLA leave are impermissible, [p]laintiff needed to present evidence indicative of retaliatory animus" (citation omitted)); *Kerman-Mastour v. Fin. Indus. Regul. Auth., Inc.*, 814 F. Supp. 2d 355, 372 (S.D.N.Y. 2011) (holding that where plaintiff's supervisor, "who participated in the decision to terminate her," made remark "suggest[ing] that the plaintiff was less able to do her job" as a woman "while the employer was considering terminating her," "this one remark was not sufficient to defeat summary judgment where the defendant adduced substantial evidence that . . . [plaintiff]'s job performance was not satisfactory").

* * *

For all these reasons, Sparks fails to establish that his termination gives rise to an inference of retaliatory intent and fails to make out a prima facie case for retaliation. Therefore, his FMLA retaliation claim fails at the first stage of the *McDonnell Douglas* framework. Even if he had established a prima facie case, no reasonable jury could determine that the Times's justification for his termination was pretext for FMLA retaliation, and his claim would fail at the third stage of the *McDonnell Douglas* framework. Accordingly, on the undisputed facts, the Times is entitled to judgment as a matter of law on Sparks's FMLA retaliation claim.

**B. FMLA Interference**

The Court now turns to Sparks's FMLA interference claim. As a threshold matter, the parties disagree over the legal standard the Court should apply in evaluating it. The Times argues that Sparks has "inappropriat[ely] fram[ed]" his FMLA claims as sounding in both interference and retaliation, and that FMLA interference claims based on wrongful termination should be evaluated under "the rubric of FMLA retaliation claims" — that is, they should be "subject to the *McDonnell Douglas* burden shifting standard." Br. at 15 (quoting *Geromanos v. Columbia Univ.*, 322 F. Supp. 2d 420, 433 (S.D.N.Y. 2004)). Sparks contends that his interference and retaliation claims should be treated separately and that, to prevail on the former, he "must establish: (1) that []he is an eligible employee under the FMLA; (2) that the defendant is an employer as defined by the FMLA; (3) that []he was entitled to leave under the FMLA; (4) that []he gave notice to the defendant of her intention to take leave; and (5) that defendants denied h[im] benefits to which []he was entitled under the FMLA." *Haran*, 160 F.4th at 56-57 (quoting *Graziadio*, 817 F.3d at 424); *accord* Opp. at 21. In addition to that five-part standard, Sparks argues he must additionally "prove by a preponderance of the evidence that [his] taking of FMLA-protected leave constituted a negative factor in the decision to terminate [him]" to prevail on his termination-as-interference theory. Opp. at 21 (quoting *Colon v. Fashion Inst. of*

*Tech. (State Univ.)*, 983 F. Supp. 2d 277, 286 (S.D.N.Y. 2013)). The Court agrees with the Times.

As the Times notes, *see* Br. at 15, numerous courts in this Circuit have determined that a "theory of interference by termination is merely a retaliation theory in disguise" and, therefore, have treated such a claim as one of retaliation. *Henderson v. GEICO*, No. 22-cv-03513 (HG), 2024 WL 4694011, at *5 (E.D.N.Y. Nov. 6, 2024) (quoting *LeClair v. Berkshire Union Free Sch. Dist.*, No. 08-cv-01354, 2010 WL 4366897, at *6 (N.D.N.Y. Oct. 28, 2010)); *see also Robbins v. Digit. Candy Inc.*, No. 23-cv-10619 (LJL), 2024 WL 5056429, at *6 n.4 (S.D.N.Y. Dec. 9, 2024) (explaining that a plaintiff asserting termination-as-interference "must allege not only that the effect of the termination was to prevent the employee from taking leave but also that the reason for the termination was that the employee attempted to exercise FMLA rights," and thus *McDonnell Douglas* applies); *Acosta v. New York Times Co.*, No. 25-cv-01119 (JPC), 2025 WL 3468042, at *7 n.3 (S.D.N.Y. Dec. 3, 2025) ("'[S]everal courts in this Circuit have cautioned that claims of this nature should be considered retaliation claims, not interference claims, and must therefore be analyzed under the *McDonnell Douglas* burden shifting framework' applicable to retaliation claims." (quoting *Nikolakopoulos v. Macy's Inc.*, No. 20-cv-01641 (KPF), 2022 WL 3903595, at *26 (S.D.N.Y. Aug. 30, 2022))).

The Second Circuit has neither affirmed nor rejected this approach. Indeed, in *Greenberg v. State University Hospital - Downstate Medical Center*, the Second Circuit expressly declined to address the propriety of the district court's holding that an "FMLA interference claim . . . fail[ed] because it sound[ed] entirely in retaliation." 838 F. App'x at 605. But there is implicit support for the approach in an earlier Second Circuit decision, *Potenza v. City of New York*, 365 F.3d 165 (2d Cir. 2004). There, the plaintiff alleged that his employer demoted him "because he had indulged in a one-month medical leave" and because he had

requested accommodations for ongoing physical therapy. *Id.* at 166. In his complaint, however, the plaintiff pleaded only that his employer had "violated [his] rights under the FMLA." *Id.* at 167 (citation omitted). In determining how to evaluate this claim, the Second Circuit reasoned that the complaint "[wa]s properly read as alleging that the [employer] interfered with [plaintiff's] rights or retaliated against him for taking FMLA-protected medical leave," *id.*, but, ultimately, held that the allegations "involve[d] retaliation rather than interference," such that "*McDonnell Douglas* [wa]s applicable," *id.* at 168. The *Potenza* court also acknowledged a circuit split over how to evaluate FMLA interference and retaliation claims and, in doing so, approvingly described the Seventh Circuit's approach: focusing on "the employer's intent to . . . determin[e] . . . whether or not a violation has occurred," such that "it would be appropriate to apply the *McDonnell Douglas* analysis to claims of retaliation — where the employer's intent is material — but not to assertions of interference — where the question is simply whether the employer in some manner impeded the employee's exercise of his or her right." *Id.* at 168; *see Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 176 (2d Cir. 2006) ("This [c]ourt [in *Potenza*] noted with some favor the manner in which the Seventh Circuit had distinguished the approaches.").

Here, Sparks's FMLA interference claim relies on his contention that he was wrongfully terminated and, in that way, turns on the Times's intent in firing him. *See Woods*, 864 F.3d at 167 ("Firing an employee *for having exercised her rights* under the FMLA is certainly 'interference' with or 'restraint' of those rights." (alterations adopted) (emphasis added)). It therefore falls within the Second Circuit's understanding, expressed in *Potenza*, of claims subject to the *McDonnell Douglas* framework, *see Robbins*, 2024 WL 5056429, at *6 n.4 (explaining that a plaintiff alleging termination-as-interference must show "that the termination was wrongful," and therefore *McDonnell Douglas* applies, because without that showing of intent,

"an at-will employee would be able to protect himself from termination by simply stating an intent to take leave"), unlike a more typically intent-neutral FMLA interference claim, *see Benson v. Westchester Med. Ctr.*, No. 20-cv-05076 (PMH), 2022 WL 2702544, at *8 n.11 (S.D.N.Y. July 12, 2022) ("An interference action is not about discrimination, it is only about whether the employer provided the employee with the entitlements guaranteed by the FMLA."); *see also, e.g.*, *Mitura v. Finco Servs., Inc.*, 712 F. Supp. 3d 442, 455-56 (S.D.N.Y. 2024) ("An interference claim can arise 'where the employee is not provided with the necessary information regarding the employer's FMLA leave policies, and the employee is denied the ability to conform a desired period of leave to the employer's policies so as to preserve the right to reinstatement.'" (quoting *Fernandez v. Windmill Distrib. Co.*, 159 F. Supp. 3d 351, 363 (S.D.N.Y. 2016))). Indeed, at least one district court in this Circuit appears to have derived from *Potenza* a rule that "[t]he Second Circuit treats instances in which an employer allegedly disrupts an employee's FMLA rights through termination as a form of retaliation and applies the retaliation analysis from *McDonnell Douglas*." *Hewett v. Triple Point Tech., Inc.*, 171 F. Supp. 3d 10, 19 (D. Conn. 2016) (citing *Potenza*, 365 F.3d at 168); *accord DeJesus v. Bon Secours Cmty. Hosp.*, No. 23-cv-00806 (VB), 2024 WL 554271, at *4 (S.D.N.Y. Feb. 12, 2024).

Sparks's preferred standard — adding a "negative factor" test to the five-part interference standard and requiring that it be established by a preponderance of the evidence, *see* Opp. at 21 (quoting *Colon*, 983 F. Supp. 2d at 286) — does not reflect the state of the law in this Circuit. As authority for it, Sparks quotes *Colon*, where the district court, in turn, purported to quote the Second Circuit's holding in *Sista* that such a standard applies to termination-as-interference claims. *See Colon*, 983 F. Supp. 2d at 286 (quoting *Sista*, 445 F.3d at 175-76). But in *Sista*, the Second Circuit was reviewing the same circuit split discussed in *Potenza*. The "negative factor" language in *Sista* was the Second Circuit's recitation — not endorsement — of another circuit's

approach to differentiating between FMLA interference and retaliation claims. *See Sista*, 445 F.3d at 175-76 (discussing "a split in the approach taken in analyzing FMLA claims" in different circuits, describing the standard repeated in *Colon* as "th[e] second [such] approach," noting that the Second Circuit had previously declined to adopt any of the other circuits' approaches, and once again declining to adopt any particular approach because plaintiff's "attempt[] to assert both 'interference' and 'retaliation' claims" failed under both the "negative factor" and *McDonnell Douglas* standards). To the extent that Sparks, the *Colon* court, or other district courts have read this language as establishing the proper framework for termination-as-interference claims, this Court does not agree.

Accordingly, the Court grants summary judgment to the Times on Sparks's FMLA interference claim because it sounds entirely in retaliation, and therefore the *McDonnell Douglas* framework applies, and the Court has already granted summary judgment to the Times on Sparks's retaliation claim. Even if the Court were to adopt Sparks's standard, the Court would find, for all the same reasons stated above, that no reasonable jury could find even by a preponderance of the evidence that Sparks's FMLA leave was a negative factor in the Times's decision to fire him, and the Court would nevertheless grant summary judgment to the Times on Sparks's FMLA interference claim.

## II. NYCHRL Discrimination

The foregoing analysis leaves only Sparks's claim for caregiver discrimination under the NYCHRL. *See* Compl. ¶¶ 65-71. The Times seeks summary judgment on that claim, arguing, among other things, that Sparks has failed to establish that he was treated differently based on his caregiver status or that the Times's stated reason for firing him was pretextual. *See* Br. at 25-28. In opposing the Times's motion on these grounds, Sparks relies entirely on the same arguments he advanced in support of his FMLA claims. *See* Opp. at 26-27. Those arguments fail here, too.

Under the NYCHRL, it is "an unlawful discriminatory practice . . . [f]or an employer . . ., because of the actual or perceived . . . caregiver status . . . of any person . . ., [t]o discriminate against such person in compensation or in terms, conditions or privileges of employment." N.Y.C. Admin. Code § 8-107(1)(a)(3). Like FMLA retaliation, NYCHRL discrimination is analyzed under the *McDonell Douglas* framework. *See Spiegel v. Schulmann*, 604 F.3d 72, 80 (2d Cir. 2010); *accord Rosen v. N.Y.C. Dep't of Educ.*, No. 18-cv-06670 (AT), 2023 WL 2647532, at *6 (S.D.N.Y. Mar. 27, 2023). However, the NYCHRL's "provisions [must] 'be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof,'" and therefore "courts must analyze NYCHRL claims separately and independently from any federal . . . claims, construing the NYCHRL's provisions 'broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible.'" *Mihalik v. Credit Agricole Cheuvreux N.A., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013) (citations omitted) (first quoting N.Y.C. Local L. No. 85 § 7; and then quoting *Albunio v. City of New York*, 947 N.E.2d 135, 137 (N.Y. 2011)).

Under the NYCHRL's more liberal construction, a plaintiff may establish his prima facie case without "show[ing] an adverse employment action" and may, instead, "only 'show differential treatment — that he was treated "less well" — because of a discriminatory intent.'" *Livingston v. City of New York*, 563 F. Supp. 3d 201, 234 (S.D.N.Y. 2021) (alteration adopted) (quoting *Mihalik*, 715 F.3d at 110). Yet "a plaintiff still must 'plead specific facts connecting defendants' conduct to' the plaintiff's protected status, or 'demonstrating how anyone similarly situated to the plaintiff was treated better or differently on account of' the protected status." *MacNeal v. City of New York*, No. 23-cv-05890 (LGS), 2025 WL 640666, at *6 (S.D.N.Y. Feb. 27, 2025) (alterations adopted) (quoting *Anandaraja v. Icahn Sch. of Med. at Mount Sinai*, 212 N.Y.S.3d 60, 63 (N.Y. App. Div. 2024)).

While the NYCHRL's pretext-stage requirements are less stringent than some other federal statutes, they are in line with those of an FMLA retaliation claim: NYCHRL discrimination is established, at the pretext stage, by a showing that "'unlawful discrimination was one of the motivating factors, even if it was not the sole motivating factor, for' [plaintiff's] unequal treatment." *Cardwell v. Davis Polk & Wardwell LLP*, No. 19-cv-10256 (GHW), 2020 WL 6274826, at *19 (S.D.N.Y. Oct. 24, 2020) (quoting *Melman v. Montefiore Med. Ctr.*, 946 N.Y.S.2d 27, 40-41 (N.Y. App. Div. 2012)); *see also id.* at *20 (explaining that this standard "seems to be equivalent to the 'motivating factor' standard of causation under Title VII and the NYSHRL); *see Mihalik*, 715 F.3d at 110 n.8 (explaining that an employer is "entitled to summary judgment [at the pretext stage] only if the record establishes as a matter of law that 'discrimination played *no* role' in its actions" (alteration adopted)).

The Times is entitled to summary judgment on Sparks's NYCHRL claim because no reasonable jury could find, based on the undisputed facts, that Sparks was treated less well than any of his colleagues due to his caregiver status,[7] or that caregiver-based discrimination played any role whatsoever in his termination. First, to the contrary, Sparks appears to have received special consideration from the Times on that basis: His PIP was longer than was customary to accommodate "a 'babymoon'" he wanted to take with his wife, JSUF ¶ 57; Williams Dep. at 177:5-13. Sparks argues that his longer PIP is a "mere red-herring[]" in this context, because he was not yet a caregiver at the time, Opp. at 26, but he misunderstands the evidence's significance. His duty at the prima facie stage, on this claim, is to raise an inference that the Times discriminated against him due to his caregiver status. *See Baptiste*, 680 F. Supp. 3d at

[7] The Times also argues that Sparks has failed to establish that he is, in fact, a caregiver. *See* Br. at 25-26. For purposes of this motion, the Court assumes (but does not decide) that Sparks has established that status.

422. His babymoon-accommodating PIP weighs against any such inference, because it is evidence that the Times was *supportive* of Sparks's becoming a parent, which is an event that could result in his becoming a caregiver. *Cf.* Opp. at 25 (Sparks arguing that the Times knew he was a caregiver because he took parental leave). Second, Sparks has provided no comparator to demonstrate that he was treated less well than non-caregiver employees at the Times — to the extent he offers Williams as a comparator for this purpose, the Court finds him ill-suited for it for the same reasons discussed above. Third, for the reasons set forth above, the evidence Sparks offers in seeking to connect discriminatory intent to his termination (the timing of his PIP; Williams's comment that he had his "hands full with [him]," Dkt. 46-30 at D002337; and the timing of his termination) fails to raise an inference of discrimination even when repackaged to sound in caregiver discrimination rather than FMLA-leave discrimination. Simply put, Sparks has pointed to no evidence — direct or indirect — that anyone at the Times was displeased by his caregiver status, let alone that anyone treated him less well because of it. For these reasons, Sparks fails to make it past the prima facie stage even under the NYCHRL's less demanding standard; no reasonable jury could find otherwise. Even if Sparks had carried his prima facie burden on this claim, it would fail at the pretext stage, because the Times has offered a legitimate reason to fire Sparks (his ongoing performance issues), and no reasonable jury could determine — based on the undisputed facts discussed above in connection with Sparks's FMLA claim — that caregiver discrimination had any role in that decision.

The Times is, therefore, entitled to judgment as a matter of law on Sparks's NYCHRL claim.

## CONCLUSION

For all the foregoing reasons, the Court GRANTS the Times's motion for summary judgment in full. The Clerk of Court is respectfully directed to terminate the motion at Dkt. 39 and CLOSE this case.

Dated: August 17, 2026
New York, New York

SO ORDERED.

JENNIFER L. ROCHON
United States District Judge